FILED

2013 May-13  AM 10:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | |
|---|---|
| VICTOR ALLEN THOMAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:11-cv-02813-RDP-RRA |
| | ) |
| DR. TALLEY, et al., | ) |
| | ) |
| Defendants. | ) |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Victor Allen Thomas, has filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging that rights, privileges, or immunities afforded him under the Constitution or laws of the United States were abridged during his incarceration at St. Clair Correctional Facility in Springville, Alabama.  Thomas  names as defendants William Talley, M.D., Colleen Oakes, former Health Services Administrator, Jeff Stone, R.N., and Correctional Medical Services, Inc.  ("CMS").  Thomas seeks monetary and injunctive relief.

In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), the complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation.  *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

On April 25, 2012, the court entered an Order for Special Report, directing that a copy of the complaint in this action be forwarded to the defendants and requesting that

they file a Special Report addressing the factual allegations of Thomas's complaint. (Doc. 9.)  Defendants were advised that the Special Report should be accompanied by sworn statements and, if appropriate, would be considered as a motion for summary judgment, filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *Id*.  By the same order, Thomas was advised that after he received a copy of the Special Report submitted by defendants, he should file counter-affidavits if he wished to rebut the matters presented by defendants in the Special Report.  *Id*.

On June 25, 2012, defendants filed a Special Report accompanied by affidavits and other institutional documents.  (Doc. 14.)  Thomas was notified that defendants' Special Report would be construed as a motion for summary judgment and he would have twenty (20) days to respond by filing affidavits and other material if he chose.  (Doc. 17.) Thomas was also advised of the consequences of any default or failure to comply with Fed. R. Civ. P. 56.  *Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).  Thomas failed to respond.

## I. <u>SUMMARY JUDGMENT STANDARD</u>

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law.  Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  In making that assessment, the court

must view the evidence in a light most favorable to the non-moving party and must draw

all reasonable inferences against the moving party. *See Chapman v. AI Transp.*, 229 F.3d

1012, 1023 (11th Cir. 2000). The burden of proof is upon the moving party to establish

his *prima facie* entitlement to summary judgment by showing the absence of genuine

issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*,

929 F.2d 604, 608 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden

of proving his action, is able to show some evidence with respect to each element of his

claim, all other issues of fact become immaterial and the moving party is entitled to

judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986);

*Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990).

As the Eleventh Circuit Court of Appeals has explained:

> Facts in dispute cease to be "material" facts when the plaintiff
> fails to establish a prime facie case. "In such a situation, there
> can be 'no genuine issue as to any material fact,' since a
> complete failure of proof concerning an essential element of
> the non-moving party's case necessarily renders all other facts
> immaterial." Thus, under such circumstances, the public
> official is entitled to judgment as a matter of law, because the
> plaintiff has failed to carry the burden of proof. This rule
> facilitates the dismissal of factually unsupported claims prior
> to trial.

*Bennett v. Parker*, 898 F.2d at 1532 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986)). However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must

be considered in opposition to summary judgment.  *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986).

## II.   <u>SUMMARY JUDGMENT FACTS</u>

Based on the foregoing summary judgment standard, the following facts are undisputed or, if disputed, taken in a light most favorable to Thomas.

Thomas was seen by a free world physician in 2010.  (Compl. at 3.)  The physician ordered a MRI for Thomas's knees.  *Id*.  Dr. White, a physician formerly employed at St. Clair Correctional Facility, informed Thomas that he had serious ligament damage to his right knee which is similar to damage in his left knee before it was replaced in 2005.  *Id*. The condition is very painful and Thomas has difficulty walking.  *Id*.

In November 2010, Dr. William Talley was hired as the Medical Director for St. Clair Correctional Facility.  (Doc. 14, Ex. 1, Talley Aff. ¶ 2.)  Dr. Talley has been licensed to practice medicine in the State of Alabama since January 2007.  *Id*.

Thomas suffers from high blood pressure.  (Doc. 14, Ex. 1, Talley Aff. ¶ 16; CMS001.)  Thomas's medical records reveal that he has been non-compliant with his medication regimen.  *Id*.  The physician preceding Dr. Talley noted on several occasions that Thomas's  hypertension was "poorly controlled." (Doc. 14, Ex. 1, Talley Aff. ¶ 16; CMS 131, 134.)

In August 2008, medical staff documented that Thomas was non-compliant with all of his medications. (Doc. 14, Ex. 1, Talley Aff. ¶ 17; CMS001.) On August 12, 2009, a nurse practitioner met with Thomas for a chronic care appointment. (Doc. 14, Ex. 1, Talley Aff. ¶ 17; CMS008.) The nurse noted that Thomas's blood pressure measured 210/117, which is considered severely hypertensive. *Id*. The nurse immediately provided Thomas a dose of blood pressure medications and placed him in the infirmary for monitoring. (Doc. 14, Ex. 1, Talley Aff. ¶ 17; CMS171.) Within one and a half hours, Thomas's blood pressure decreased to 130/102, which is slightly high but within a safe range. *Id*. The nurse educated Thomas on the importance of proper medication compliance but two months later, Thomas failed to pick up any of his four (4) blood pressure medications from October 8, 2009, through November 17, 2009. (Doc. 14, Ex. 1, Talley Aff. ¶ 17; CMS008, 016-17, 171). Thomas also skipped ten (10) doses of his blood pressure medications from July 22, 2010, through July 31, 2010. (Doc. 14, Ex. 1, Talley Aff. ¶ 17; CMS200-02.) Thomas also refused to take his blood pressure medications from November 3, 2010, to November 11, 2010. (CMS207-07.)

The physician preceding Dr. Talley had prescribed Thomas Ultram 100 mg twice a day for his knee pain. (Doc. 14, Ex. 1, Talley Aff. ¶ 24.) On December 20, 2010, Thomas reported to the Health Care Unit on an urgent basis to have his medications renewed. (Doc. 14, Ex. 1, Talley Aff. ¶ 24; CMS052.) Because Thomas's Ultram

prescription was set to expire before Dr. Talley could meet with him, Dr. Talley renewed Thomas prescription for only 50 mg twice a day.  (Doc. 14, Ex. 1, Talley Aff. ¶ 24; CMS184.)  Dr. Talley determined that Thomas's previous dosage was fairly high and he needed to meet with Thomas before justifying writing a prescription for the higher dosage.  (Doc. 14, Ex. 1, Talley Aff. ¶ 24.)

On December 22, 2010, Thomas submitted a sick call request form requesting to see Dr. Talley regarding his pain medications.  (Doc. 14, Ex. 1, Talley Aff. ¶ 25; CMS055.)  Medical staff scheduled Thomas's appointment for December 27, 2010.  *Id*. However, on December 27, 2010, Thomas  signed a release of responsibility form refusing to attend sick call.  (Doc. 14, Ex. 1, Talley Aff. ¶ 25; CMS056.)

Despite Thomas's failure to attend sick call, Dr. Talley met with him on December 29, 2010, regarding his knee complaint and medications.  (Doc. 14, Ex. 1, Talley Aff. ¶ 26; CMS140.)  During this visit, Thomas explained that he did not have any mechanical symptoms concerning his knee, meaning he ambulated without difficulty.  *Id*.  Thomas did experience occasional swelling which was relieved by Ultram.  *Id*.  Dr. Talley performed an examination of Thomas's knee and noted that he did not appear to have excess fluid under his skin or in his joints.  *Id*.  In addition to the examination, Dr. Talley reviewed Thomas's June 3, 2010, MRI report.  *Id*.  Based on the report, Thomas's subjective complaints, and Dr. Talley's examination of Thomas's knee, Dr. Talley

determined that Thomas has osteoarthritis of his right knee. *Id.* Dr. Talley further determined that Ultram 100 mg twice a day was an appropriate dosage to alleviate Thomas's discomfort and prescribed the same. (Doc. 14, Ex. 1, Talley Aff. ¶ 26; CMS140.)

Dr. Talley also requested an orthopedic surgery consultation regarding Thomas's knee. (Doc. 14, Ex. 1, Talley Aff. ¶ 26; CMS057, 140.) Dr. Talley contends that by requesting the consultation, he was not inferring that Thomas required surgery. *Id.* Dr. Talley noted that Thomas's knee condition appeared to be well-controlled by Ultram. *Id.* It is Dr. Talley's practice to request further consultations to determine if other medical interventions are available. (Doc. 14, Ex. 1, Talley Aff. ¶ 26.) On January 31, 2011, the regional medical director proposed that Dr. Talley pursue an alternative treatment plan for Thomas before considering surgical options. (Doc. 14, Ex. 1, Talley Aff. ¶ 26; CMS058.)

Thomas's medication non-adherence and resulting blood pressure instability were relevant to CMS's decision not to authorize surgery for his knee. (Doc. 14, Ex. 1, Talley Aff. ¶ 18.) Thomas's poorly controlled blood pressure would put him at an increased risk of life threatening complications during surgery. *Id.* These complications include blood clots, stroke, heart attack, and adverse reactions to anesthesia. *Id.* Additionally, recovery from surgery requires compliance with post-operation treatment plans including

medications, diet, and physical therapy.  *Id*.  Thomas is also diabetic and has a pre-existing left knee condition which required a total knee replacement in 2005.  *Id*. Therefore, Thomas was not a good surgical candidate.  *Id*.

On February 7, 2011, Thomas submitted a sick call request form, complaining of knee discomfort and requesting to review the MRI report.  (Doc. 14, Ex. 1, Talley Aff. ¶ 27; CMS059.)  On February 9, 2011, the nursing staff examined Thomas's right knee and determined that it was not swollen or warm to the touch.  (Doc. 14, Ex. 1, Talley Aff. ¶ 27; CMS060.)  The nursing staff further determined that Thomas's gait was within normal limits and his knee had a normal range of motion.  *Id*.  The nursing staff did note that Thomas experienced some pain with certain movements and that his knee was tender and weak.  *Id*.  The staff referred Thomas to meet with Dr. Talley on February 10, 2011, for further evaluation.  (Doc. 14, Ex. 1, Talley Aff. ¶ 27; CMS061.)

On February 10, 2011, Dr. Talley met with Thomas who stated that his discomfort was well controlled with Ultram.  (Doc. 14, Ex. 1, Talley Aff. ¶ 27; CMS142.) Dr. Talley also discussed the MRI results with Mr. Talley.  *Id*.  Dr. Talley explained that surgery was not an appropriate option at the time, and alternative treatment would continue.  *Id*.  After the appointment, Thomas never requested surgery or any other off-site consultation for his knee.  *Id*.  Dr. Talley renewed Thomas's "no standing and walking" profile.  (Doc. 14, Ex. 1, Talley Aff. ¶ 27; CMS063.)   Dr. Talley also ordered Thomas a cane and an egg

8

crate mattress. *Id*. Dr. Talley thought Thomas might appreciate the mattress from a comfort standpoint. *Id*. Other than this consideration, Thomas did not have any medical condition for which the egg crate mattress was needed. *Id*. Dr. Talley did not realize at the time that CMS only provided egg crate mattresses to individuals with specific medical indications because the mattresses are in limited supply and must be saved for those individuals for whom the mattresses provide a medical benefit. (Doc. 14, Ex. 1, Talley Aff. ¶ 27.) Therefore, Thomas was not provided with an egg crate mattress. *Id*. Thomas alleges that Nurse Jeff Stone and former Health Services Administrator Colleen Oakes did not want him to receive an egg crate mattress and wrongfully interfered with Dr. Talley's order for the same. (Compl. at 5.) On February 15, 2011, the nursing staff examined Thomas regarding his knee complaint. (Doc. 14, Ex. 1, Talley Aff. ¶ 28; CMS065-66.) The nursing staff observed slight swelling to his right knee and he was referred to Dr. Talley for further evaluation. *Id*.

On February 21, 2011, Dr. Talley met with Thomas but Thomas did not complain about his knee. (Doc. 14, Ex. 1, Talley Aff. ¶ 28; CMS143.) Rather, Thomas complained for the first time that he had chronic lower back discomfort and that he needed an egg crate mattress. *Id*. Dr. Talley explained that he could only approve the use of an egg crate mattress for individuals with bed sores. *Id*. Dr. Talley performed an examination of Thomas's back and determined that his range of motion was limited due to his

discomfort.  *Id*.  Dr. Talley ordered a "front of the line" profile to allow Thomas to move to the front of the line for pill call and in the cafeteria.  *Id.*

On March 28, 2011, Thomas was seen for a pain medication renewal.  (Doc. 14, Ex. 1, Talley Aff. ¶ 29; CMS068-70.)  Thomas noted that his back was improved.  *Id*.

On March 30, 2011, Dr. Talley met with Thomas who stated that he did not have any changes or new issues.  (Doc. 14, Ex. 1, Talley Aff. ¶ 29; CMS144.)  Thomas did say that he was having difficulty with pill call and wanted to have his medications changed to KOP (keep on person).  (Doc. 14, Ex. 1, Talley Aff. ¶ 29; CMS148.)  Dr. Talley ordered that all of Thomas's prescriptions, with the exception of Ultram, be changed to KOP.[1]  *Id*.  Dr. Talley also ordered a drug screening to determine whether Thomas was actually taking Ultram.  (Doc. 14, Ex. 1, Talley Aff. ¶ 29; CMS144.)

On April 4, 2011, medical staff attempted to administer a urinalysis of Thomas to screen for Ultram compliance.  (Doc. 14, Ex. 1, Talley Aff. ¶ 30; CMS072).  Thomas filled his cup with water and refused to provide a urine sample.  *Id*.  On April 11, 2011, Dr. Talley discontinued Thomas's Ultram prescription and ordered Mobic, a medication commonly used to alleviate the discomfort associated with osteoarthritis. (Doc. 14, Ex. 1, Talley Aff. ¶ 30; CMS187.)

---

[1]    Dr. Talley explains that in some cases, inmates request KOP in order to horde or sell their medications.  (Doc. 14, Ex. 1, Talley Aff. ¶ 29.)  Thus, narcotics, or similar medications such as Ultram, are never permitted to be kept on the person.  *Id*.

On April 13, 2011, Thomas submitted a sick call request form.  (Doc. 14, Ex. 1, Talley Aff. ¶ 30; CMS073.)   On April 15, 2011, the nursing staff met with Thomas.  *Id*. at CMS074.  Thomas complained that Mobic upset his stomach.  *Id*.

On April 21, 2011, Dr. Talley met with Thomas who explained that he could not tolerate his current pain medication because it caused his stomach to become upset and blood in his stools.  *Id*. at CMS146.  Dr. Talley placed Thomas back on Ultram for seven (7) days to alleviate his discomfort while he evaluated other treatment and medication options.  *Id*.  Dr. Talley also renewed Thomas's walking cane, and his "front of the line" and "no prolonged standing/walking" profiles.   (Doc. 14, Ex. 1, Talley Aff. ¶ 30; CMS076.) Additionally, Dr. Talley ordered x-rays of Thomas's right knee and lower spine.  (Doc. 14, Ex. 1, Talley Aff. ¶ 30; CMS146,187.)

Medical staff took x-rays of Thomas's knee and lower spine on April 25, 2011. (Doc. 14, Ex. 1, Talley Aff. ¶ 30; CMS219.)  The x-ray showed narrowing of Thomas's knee joint which is characteristic of osteoarthritis.  *Id*.  The x-ray showed that the knee was otherwise aligned properly and that it was not fractured or dislocated.  *Id*.  The x-rays also revealed that Thomas's spine was a normal height and alignment, that there were no fractures or lesions, and that his spine was normal.  (Doc. 14, Ex. 1, Talley Aff. ¶ 30; CMS220.)   Based on these results, Dr. Talley determined that he would continue

conservative pain management and that there was no reason to consider surgery at that time. *Id*.

Dr. Talley met with Thomas on April 28, 2011, to discuss alternative treatment and medication options. (Doc. 14, Ex. 1, Talley Aff. ¶ 31; CMS147.) Dr. Talley observed that Thomas's gait was slow and "stooped." *Id*. Thomas stated that he was experiencing increased discomfort when walking. *Id*. Medical staff provided Thomas with a cane and he acknowledged receipt of it. (Doc. 14, CMS079.) Thomas's cane appeared to assist his mobility. (Doc. 14, Ex. 1, Talley Aff. ¶ 31; CMS147.) Thomas stated that Mobic did not relieve his pain, only Ultram. *Id*. Dr. Talley informed Thomas that Ultram is not an ideal long-term treatment because patients can become dependent on it. *Id*. Dr. Talley recommended consideration of alternative treatments such as steroid injections and physical therapy. (Doc. 14, Ex. 1, Talley Aff. ¶ 31; CMS147.) Dr. Talley also recommended a pain reliever named Toradol. *Id*. Thomas refused Toradol and stated that he did not want these alternative treatments, and only wanted Ultram. *Id*. Due to Thomas's complaints regarding Mobic, Dr. Talley discontinued the prescription. *Id*. Instead, Dr. Talley prescribed Thomas Voltaren which is a medication commonly used to treat the pain and inflammation associated with arthritis, and which Dr. Talley thought would be an appropriate alternative treatment to Ultram. *Id*.

On April 28, 2011, Thomas submitted a sick call request form requesting that Dr. Talley renew his medications. (Doc. 14, Ex. 1, Talley Aff. ¶ 32; CMS080.) On May 2, 2011, the nursing staff evaluated Thomas's knee and noted that his knee condition appeared stable although he did have slight swelling. (Doc. 14, Ex. 1, Talley Aff. ¶ 32; CMS081-82.)

The next day, Dr. Talley met with Thomas to further evaluate his condition. (Doc. 14, Ex. 1, Talley Aff. ¶ 32; CMS148.) Thomas did not have any complaints about his lower back at this time. *Id*. After Dr. Talley informed Thomas in February 2011 that egg crate mattresses are only indicated for bed sores, Thomas rarely mentioned his back discomfort. *Id*. Thomas complained that Voltaren was not healing his knee pain and that his pain was only relieved by Ultram or Vicodin. *Id*. Medical staff only provided Thomas Voltaren for ten (10) days. *Id*. Therefore, Dr. Talley continued Thomas's Voltaren prescription to see if it would provide relief when given additional days to enter his system. *Id*. However, to alleviate Thomas's discomfort in the interim, Dr. Talley prescribed him Ultram for three (3) more days. (Doc. 14, Ex. 1, Talley Aff. ¶ 32; CMS148.)

On May 6, 2011, Thomas submitted a sick call request form requesting to see Dr. Talley for his knee and back pain. (Doc. 14, Ex. 1, Talley Aff. ¶ 33; CMS083.) On May 9, 2011, the nursing staff met with Thomas and he complained of pain in both knees

stating that he bumped them on his bed.  (Doc. 14, Ex. 1, Talley Aff. ¶ 33; CMS084-85.)
Thomas did not have any complaints about his back.  *Id.*

On May 11, 2011, Dr. Talley met with Thomas for both his chronic care
appointment and regarding his knee and back complaints.  (Doc. 14, Ex. 1, Talley Aff.
¶ 34; CMS086.)  During this visit, Thomas demanded that Dr. Talley put him back on
Ultram long-term.  *Id.*  Dr. Talley explained that the best option was to continue to
evaluate other treatments because Ultram is not a good long-term option due to
dependency issues.  *Id.*  Dr. Talley offered to give Thomas a one-time dose of Ultram to
alleviate his immediate pain.  *Id.*  However, Thomas refused to take the Ultram and
slammed his cane down before leaving.  *Id.*

On June 15, 2011, Dr. Talley met with Thomas for a follow-up appointment
regarding his back and knee discomfort.  (Doc. 14, Ex. 1, Talley Aff. ¶ 35; CMS149.)
Thomas stated that Voltaren provided some relief.  *Id.*  However, Thomas requested that
Dr. Talley discontinue Voltaren and provide Ultram on a short-term basis.  *Id.*  Thomas
was not pleased with the other medication options but was "willing to take Tylenol daily
with Ultram sparingly."  *Id.*  Dr. Talley continued to prescribe Thomas Voltaren.  *Id.*  He
also prescribed Ultram for two (2) days to supplement the Voltaren.  *Id.*  Dr. Talley
prescribed Ultram as "crush and float" meaning that the medical staff crushes it in a cup
of water which the inmate then drinks.  (Doc. 14, Ex. 1, Talley Aff. ¶ 35; CMS149.)  This

prevents an inmate from pretending to take medication but hiding it in his cheek in order to take multiple doses all at one time or in order to sell the medication.[2]  *Id*.

On June 20, 2011, Dr. Talley reviewed a medication non-adherence report which showed that Thomas had not picked up his blood pressure medications since March 31, 2011.  (Doc. 14, Ex. 1, Talley Aff. ¶ 37; CMS087-88.)  That same day, Dr. Talley met with Thomas to discuss his non-compliance.  (Doc. 14, Ex. 1, Talley Aff. ¶ 37; CMS150.) Thomas explained that he was deliberately refusing to take his medications because he wanted Ultram.  *Id*.  Thomas further explained that he refused to take any other pain medication other than Ultram.[3]  *Id*.

Dr. Talley scheduled a follow-up appointment with Thomas for July 6, 2011. (Doc. 14, Ex. 1, Talley Aff. ¶ 38; CMS151.)  Thomas reiterated that he did not want any other pain medications and that only Ultram or Vicodin helped his pain.  *Id*.  Dr. Talley explained to Thomas that narcotics like Ultram are not ideal long-term prescriptions for individuals with degenerative joint disease.  *Id*.  He further explained that medications like Voltaren are actually designed specifically to treat the symptoms associated with

---

[2]  On June 18, 2011, Thomas complained of swelling in his scrotum.  (Doc. 14, Ex. 1, Talley Aff. ¶ 36; CMS0089.)  Thomas was later diagnosed with a hydrocele for which he received treatment.  (Doc. 14, Ex. 1, Talley Aff. ¶¶ 37-39, 42; CMS0150-53.)  Thomas does not allege in his complaint that medical staff failed to provide him adequate care for this condition.

[3]  Dr. Talley notes that it is his experience that the refusal to take other medications is consistent with drug seeking behavior.  (Doc. 14, Ex. 1, Talley Aff. ¶ 37; CMS150.)

osteoarthritis.  *Id*.  However, Dr. Talley ordered Thomas a two (2) day prescription of Ultram.  *Id*.

During another follow-up appointment on July 27, 2011, Dr. Talley evaluated Thomas's knee and back.  (Doc. 14, Ex. 1, Talley Aff. ¶ 40; CMS152.) Thomas did not have any new complaints.  *Id*.  Thomas stated that he no longer wanted a cane and did not want a walker or wheelchair either.  *Id*.  Thomas did complain that Voltaren was not adequately alleviating his pain.  *Id*.  Dr. Talley prescribed two (2) days of Ultram to supplement his Voltaren.  *Id*.  Additionally, Dr. Talley renewed Thomas's "no prolonged standing/walking" and "front of the line" profiles.  *Id*.  Dr. Talley also moved Thomas to dormitory "G5" which is essentially attached to the Health Care Unit.  (Doc. 14, Ex. 1, Talley Aff. ¶ 40; CMS152.)

On July 31, 2011, Thomas submitted a sick call request form stating that he needed to see Dr. Talley regarding his knee and was scheduled for an appointment on August 3, 2011.  (Doc. 14, Ex. 1, Talley Aff. ¶ 41; CMS101.)  The day before Thomas's appointment, medical staff provided Dr. Talley with a report showing that Thomas did not pick up his Tylenol.  *Id*. at CMS102.

During Thomas's appointment on August 3, 2011, Dr. Talley explained that Thomas's failure to comply with his medication schedule undermined their ability to

evaluate alternative treatments. *Id*. at CM153. Dr. Talley discontinued Thomas's Tylenol prescription. *Id*.

On August 5, 2011, a physician's assistant met with Thomas for a chronic care appointment. (Doc. 14, Ex. 1, Talley Aff. ¶ 42; CMS106.) Thomas stated that he would not take his other medications until he received "treatment for his pain." *Id*. The physician's assistant discussed the risks of non-compliance with Thomas including stroke or heart attack. *Id*.

Dr. Talley met with Thomas later that day for a follow-up appointment regarding his various complaints. (Doc. 14, Ex. 1, Talley Aff. ¶ 42; CMS153.) Thomas stated that his medications were providing minimal relief. *Id*. Dr. Talley provided Thomas a one (1) day prescription of Ultram but reminded him that he needed to comply with his medications to adequately evaluate their effectiveness. *Id*.

On August 31, 2011, Thomas submitted a sick call request form requesting that Dr. Talley renew his medications. (Doc. 14, Ex. 1, Talley Aff. ¶ 43; CMS108.) On September 2, 2011, the nursing staff evaluated Thomas's knee but did not note any differences from Thomas's previous visits. (Doc. 14, Ex. 1, Talley Aff. ¶ 42; CMS109-10.) On September 7, 2011, Dr. Talley met with Thomas who complained that he was experiencing additional pain. (Doc. 14, Ex. 1, Talley Aff. ¶ 43; CMS154.) Dr. Talley prescribed Thomas Ultram for seven (7) days. *Id*. Dr. Talley reminded Thomas that he

was already providing him with Voltaren and would only supplement with Ultram on a short-term basis. *Id*.

Thomas submitted a sick call request form on September 29, 2011, requesting to see Dr. Talley about his knee. (Doc. 14, Ex. 1, Talley Aff. ¶ 44; CMS113.) Medical staff scheduled Thomas's appointment for October 3, 2011. *Id*. However, on September 30, 2011, Thomas reported to the Health Care Unit on an emergency basis complaining of pain in both knees and his groin. (Doc. 14, Ex. 1, Talley Aff. ¶ 44; CMS114-15.) The nursing staff provided Thomas with ibuprofen but Thomas refused to take it. *Id*.

Dr. Talley met with Thomas on October 4, 2011. (Doc. 14, Ex. 1, Talley Aff. ¶ 44; CMS158.) Thomas complained that the cold weather was causing him additional discomfort in his knee. *Id*. Dr. Talley provided Thomas with three (3) days of Ultram to supplement his Voltaren. *Id*.

On October 11, 2011, Thomas submitted a sick call request form to see Dr. Talley regarding his knee. (Doc. 14, Ex. 1, Talley Aff. ¶ 45; CMS120.) Medical staff scheduled an appointment for Thomas for October 14, 2011, but he did not show up. *Id*. However, Dr. Talley met with Thomas later that day to discuss his blood pressure. (Doc. 14, Ex. 1, Talley Aff. ¶ 45; CMS161.) Dr. Talley explained to Thomas that his blood pressure was consistently stable when he took his blood pressure medications. *Id*. Dr. Talley further emphasized that Thomas could adequately control his hypertension simply by

adhering to his medication regimen. *Id*. Thomas became angry that Dr. Talley was not giving him Ultram long-term for his knee and back. *Id*. Thomas stated that he was going to "call his folks to get the Ultram." *Id*.

Thomas complains that he paid $3.00 every week for Dr. Talley to prescribe him pain medication for only two (2) days. (Compl. at 4-5.) Thomas owes over $200.00 in co-payments, mainly for follow up treatment for his knees and back. *Id*. at 5.

On October 24, 2011, Dr. Talley met with Thomas and determined that his knee pain was not responding well to the alternative medications. (Doc. 14, Ex. 1, Talley Aff. ¶ 46; CMS162.) Dr. Talley prescribed Thomas 100 mg of Ultram to be taken twice a day for 30 days. *Id*. Dr. Talley cautioned Thomas that he would discontinue Ultram if Thomas's urinalysis was ever positive for any drugs that were not prescribed or if it was not positive for Ultram. *Id*.

On November 23, 2011, during a follow up appointment, Thomas told Dr. Talley that his condition was well controlled and that he had no new complaints. (Doc. 14, Ex. 1, Talley Aff. ¶ 47; CMS163.) Dr. Talley renewed Thomas's Ultram prescription for an additional thirty (30) days. *Id*.

Dr. Talley met with Thomas on a monthly basis to evaluate his condition. (Doc. 14, Ex. 1, Talley Aff. ¶ 47; CMS164-65, 167.) During each visit, Thomas explained that his pain was well controlled and that he did not have any further complaints. *Id*.

The medical staff at St. Clair Correctional Facility maintain a grievance procedure for any inmate who wishes to voice a complaint regarding any medical treatment he has sought or received during his incarceration at St. Clair. (Doc. 14, Ex. 1, Talley Aff. ¶ 12.) The initial orientation process at St. Clair also includes educating inmates on the availability of the grievance process. *Id.* The grievance process is initiated when an inmate submits a Medical Grievance form to the Health Services Administrator ("HSA") through the institutional mail system. *Id.* The HSA reviews the request and responds within five (5) days of receipt of the Medical Grievance. *Id.*

The medical staff's written response to a Medical Grievance is included on the bottom portion of the same form containing the inmate's Medical Grievance. (Doc. 14, Ex. 1, Talley Aff. ¶ 13.) Below the portion of the form designated for the "Response," the following notation appears:

> If you wish to appeal a grievance response you may file a Grievance Appeal. Return the completed form to the attention of the Health Services Administrator. You may place the form in the sick call box or give it to the segregation sick call nurse on rounds.

(Doc. 14, Ex. 1, Talley Aff. ¶ 13.)

The second step of the grievance process involves the submission of a Medical Grievance Appeal. *Id.* Written responses to Medical Grievances and Appeals are provided within five (5) days of receipt. *Id.* Medical Grievance forms are available from

the correctional officers at St. Clair.  *Id*.  Inmates are instructed to place completed Medical Grievance forms in the sick call boxes located throughout the facility.  *Id*.  When received in the Health Care Unit, the forms are sent to the HSA by the medical records clerk or administrative assistant.  *Id*.  The HSA reviews the grievances daily, provides a written response within five (5) days at the bottom of the form, and returns a copy of the completed form to the inmate.  (Doc. 14, Ex. 1, Talley Aff. ¶ 13.)

During Thomas's incarceration at St. Clair, he submitted one (1) Medical Grievance form related to the allegations of his complaint.  (Doc. 14, Ex. 8, Oakes Aff. ¶ 4; CMS224.)  On February 11, 2011, Thomas submitted a Medical Grievance form complaining that Dr. Talley canceled his order to receive a cane and an egg crate mattress. *Id*.  Thomas specifically complained that Dr. Talley never explained the reason for changing his order.  *Id*.  Colleen Oakes, the HSA at the time, responded within five (5) days and informed Thomas that she would have Dr. Talley contact him about the changes. *Id*.  Following Oakes's response to Thomas's Medical Grievance, Thomas did not submit a Medical Grievance Appeal.  *Id*.

### III.  DISCUSSION

**A.    Exhaustion of Administrative Remedies.**

Defendants contend that Thomas's claims are due to be dismissed because he failed to exhaust his administrative remedies.  The Eleventh Circuit Court of Appeals has said

that the exhaustion defense "is not ordinarily the proper subject for a summary judgment; instead, it 'should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment.'" *Bryant v. Rich*, 530 F.3d 1368, 1375 (11th Cir. 2008) (quoting *Ritza v. Int'l Longshoremen's & Warehousemen's Union*, 837 F.2d 365, 368-69 (9th Cir. 1988)).  Therefore, the court will analyze whether Thomas properly exhausted his administrative remedies using the standard set forth in *Bryant*.  "First, the court looks to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, takes the plaintiff's version of the facts as true.  If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed."  *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008) (citing *Bryant*, 530 F.3d at 1373-74).

In 1996, Congress enacted the Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (1996) ("PLRA") in an attempt to control the flood of prisoner lawsuits.  Title 42 U.S.C. § 1997e(a), as amended by the PLRA, provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

Thomas's allegations that Defendants Talley, Oakes, Stone, and CMS, Inc. were deliberately indifferent to his serious medical needs concern the conditions under which

he was confined at the St. Clair Correctional Facility.  Additionally, medical staff at St.

Clair maintained a grievance procedure for inmates to file complaints regarding medical

treatment.  The initial orientation process at St. Clair included educating inmates on the

availability of the grievance process.  The grievance process is initiated when an inmate

submits a Medical Grievance form to the Health Services Administrator ("HSA") through

the institutional mail system.   Medical Grievance forms are available from the

correctional officers at St. Clair.  Inmates are instructed to place completed Medical

Grievance forms in the sick call boxes located throughout the facility.  When received in

the Health Care Unit, the forms are sent to the HSA by the medical records clerk or

administrative assistant.  The HSA reviews the grievances daily, provides a written

response within five (5) days at the bottom of the form, and returns a copy of the

completed form to the inmate. The HSA's written response to a Medical Grievance is

included on the bottom portion of the same form containing the inmate's Medical

Grievance.  Below the portion of the form designated for the "Response," the following

notation appears:

> If you wish to appeal a grievance response you may file a
> Grievance Appeal.  Return the completed form to the attention of
> the Health Services Administrator.  You may place the form in the
> sick call box or give it to the segregation sick call nurse on
> rounds.

In *Alexander v. Hawk*, the Eleventh Circuit Court of Appeals discussed the amendment of 42 U.S.C. § 1997e by the PLRA, concluding that "Congress now has mandated exhaustion," and that "exhaustion is now a pre-condition to suit [by a prisoner]." 159 F.3d 1321, 1325-26 (11th Cir. 1998). The Eleventh Circuit has also made it very clear that a district court may not waive this exhaustion requirement. The United States Supreme Court, interpreting the intent of Congress, concluded that exhaustion of administrative remedies is now mandatory even if the procedures to do so do not meet certain "minimum acceptable standards" of fairness and effectiveness, and courts cannot excuse exhaustion even when it would be "appropriate and in the interest of justice." *Booth v. Churner*, 532 U.S. 731, 740 n.5 (2001).

During Thomas' incarceration at St. Clair, he submitted one (1) Medical Grievance form on February 11, 2011, complaining that Dr. Talley canceled his order to receive a cane and an egg crate mattress. Colleen Oakes responded within five (5) days and informed Thomas that she would have Dr. Talley contact him about the changes. On February 21, 2011, Dr. Talley met with Thomas and explained that he could only approve the use of an egg crate mattress for individuals with bed sores. Thomas does not dispute that following Oakes's response to his Medical Grievance, he did not submit a Medical Grievance Appeal. Neither does Thomas dispute that he failed to file a Medical Grievance form concerning his allegations that he was being denied medical treatment for

his knee and lower back and his complaints that he was being charged a co-payment. Therefore, Thomas did not exhaust the grievance procedure concerning his claims.

Based on the foregoing, Thomas's claims against defendants are due to be dismissed without prejudice for his failure to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a).

**B.**   **Eighth Amendment – Deliberate Indifference.**

Even if Thomas had exhausted his administrative remedies, his claims are still due to be dismissed because he has failed to show that defendants were deliberately indifferent to his serious medical needs. The United States Supreme Court has held that it is only deliberate indifference to serious medical needs which is actionable under 42 U.S.C. § 1983. *See Estelle v. Gamble*, 429 U.S. 97 (1976). Indeed, the conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain to be actionable under § 1983. *See Bass v. Sullivan*, 550 F.2d 229 (5th Cir. 1977). Mere negligence is insufficient to support a constitutional claim. *See Fielder v. Brossard*, 590 F.2d 105 (5th Cir. 1979). Moreover, an accidental or inadvertent failure to provide medical care, or negligent diagnosis or treatment of a medical condition, does not constitute a wrong under the Eighth Amendment. *See Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980). Additionally, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v.*

*Gamble*, 429 U.S. at 106.   Neither will a mere difference of opinion between an inmate

and the institution's medical staff as to treatment and diagnosis alone give rise to a cause

of action under the Eighth Amendment.   *See Smart v. Villar*, 547 F.2d 112 (10th Cir.

1976); *see also Estelle v. Gamble*, 429 U.S. 97, 106-08 (1976).

Deliberate indifference can be shown in a variety of ways.   As the Eleventh Circuit

Court of Appeals noted:

> Our cases have consistently held that knowledge of the need
> for medical care and an intentional refusal to provide that care
> constitutes deliberate indifference.   Medical treatment that is
> "so grossly incompetent, inadequate, or excessive as to shock
> the conscience or to be intolerable to fundamental fairness"
> constitutes deliberate indifference.   Additionally, when the
> need for medical treatment is obvious, medical care that is so
> cursory as to amount to no treatment at all may constitute
> deliberate indifference.

*Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995) (internal citations omitted).

Thomas alleges that he was seen by a free world doctor in 2010 who ordered an

MRI for Thomas's knees.   Dr. White, a preceding physician at St. Clair, explained to

Thomas that there was serious ligament damage to his right knee.   Thomas's left knee had

already been replaced in 2005 which caused him severe pain and difficulty in walking.

Thomas contends that CMS, Inc. would not authorize surgery for his knee.   Thomas

complains that Dr. Talley did not provide him with adequate pain medication.   He further

complains that Dr. Talley ordered him a cane and egg crate mattress but Nurse Stone and

Colleen Oakes denied him the mattress, alleging that he could have one only if he suffered from a hernia or bed sores.  Thomas argues that he was charged a co-payment each week and only received two (2) days worth of pain medication.

Viewing the facts in a light most favorable to Thomas, the pain in his right knee and lower back constituted a serious medical need.  However, he has not shown that defendants were deliberately indifferent to that need.  The undisputed medical evidence shows that from November 2010 to November 2011 and beyond, Dr. Talley routinely examined Thomas, prescribed him pain medication, and requested diagnostic procedures in response to Thomas's complaints of knee pain.   The medical record is void of evidence that Dr. Talley had subjective knowledge of, and disregarded, a risk of serious harm to Thomas due to his chronic pain.  To the contrary, the record establishes that Dr. Talley regularly examined Thomas and treated him.  There is no evidence that Dr. Talley ever refused to treat him or was otherwise deliberately indifferent to Thomas's medical condition.

Thomas does not dispute that he was not a good candidate for surgery due to his non-compliance with his medications and blood pressure instability.  Although Thomas preferred Ultram for pain, he does not dispute that Dr. Talley prescribed him alternative pain medications because Ultram, a narcotic, is not feasible long-term treatment because a patient may become dependent on it. Neither does Thomas dispute that Dr. Talley

initially ordered an egg crate mattress only for Thomas's comfort but was later informed by medical staff that the mattresses are in limited supply and reserved for individuals with indicated medical conditions. Thomas does not allege that he has any documented medical condition which would requires an egg crate mattress. The fact that Thomas disagrees with the efficacy of the treatment recommended or simply preferred a different course of treatment does not state a constitutional claim. Indeed, "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis and course of treatment [does not] support a claim of cruel and unusual punishment." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).

Moreover, there is no evidence that the treatment provided to Thomas was "so grossly incompetent, inadequate, or excessive as to shock the conscience." *Adams v. Poag*, 61 F.3d 1537, 1544, 1545 (11th Cir. 1995) (whether governmental actors "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment") (quoting *Estelle*, 429 U.S. at 107). The Eleventh Circuit Court of Appeals has recognized that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989).

Additionally, Thomas's complaint that defendants wrongfully charged him a medical co-payment does not state a claim for relief.  A prisoner does not have a "general constitutional right to free health care." *Reynolds v. Wagner*, 128 F.3d 166, 174 (3d Cir. 1997) .  It is not deliberate indifference for a prison medical provider to require a prisoner to pay a co-payment before receiving care when he has the ability to pay.  *See Poole v. Isaacs*, 703 F.3d 1024, 1027 (7th Cir. 2012). "[S]uch a requirement simply represents an insistence that the prisoner bear a personal expense that he or she can meet and would be required to meet in the outside world." *Reynolds*, 128 F.3d at 174.  Although Thomas cannot be denied health care based on his inability to pay, he does not argue that he is unable to pay the co-payment.  Neither does he allege that he was denied medical treatment due to any inability to pay the co-payment.   Therefore, Thomas has failed to state a cognizable claim for relief concerning his medical co-payments.

Based on the foregoing, even if Thomas had exhausted his administrative remedies, his Eighth Amendment medical care claims against defendants are due to be dismissed because he has failed to show that they were deliberately indifferent to his serious medical needs. To the extent Thomas may be attempting to assert medical malpractice claims against defendants as a supplemental claim to his § 1983 action, such claims would be subject to dismissal pursuant to 28 U.S.C. § 1367(c)(3) once all other claims over which this court has jurisdiction have been dismissed, as recommended herein.

## **RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT**

Accordingly, for the reasons stated above, the magistrate judge RECOMMENDS that this action be DISMISSED WITHOUT PREJUDICE due to plaintiff's failure to exhaust his administrative remedies under 1997e(a).

Plaintiff may file specific written objections to this report and recommendation within fifteen (15) days from the date it is filed in the office of the Clerk.  Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fifteen (15) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal.  Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.   IT IS NOT NECESSARY FOR PLAINTIFF TO REPEAT HIS LEGAL ARGUMENTS.   AS TO THE FACTS, IF PLAINTIFF DOES RESPOND, HE SHOULD LIMIT HIMSELF TO ADDRESSING THE STATEMENTS OF FACT CONTAINED IN THE REPORT AND RECOMMENDATION TO WHICH HE OBJECTS; THE FILING OF OBJECTIONS IS NOT A PROPER VEHICLE TO MAKE NEW ALLEGATIONS OR PRESENT ADDITIONAL EVIDENCE.  Objections not meeting the specificity requirement set out above will not be considered by a district judge.

A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a district judge.

The Clerk is DIRECTED to serve a copy of this report and recommendation upon the plaintiff.

DATED this 13th day of May, 2013.


Robert R. Armstrong, Jr.
United States Magistrate Judge

31